STATE of Minnesota, Respondent,

v.

Trong Kim HUYNH, Appellant.

No. C6–92–1935.

Court of Appeals of Minnesota.

Aug. 3, 1993.

Review Granted Sept. 21, 1993.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin Co. Atty., Paul R. Scoggin, Asst. Co. Atty., Minneapolis, for respondent.

John M. Stuart, State Public Defender, Lawrence Hammerling, Deputy State Public Defender, Minneapolis, for appellant.

Considered and decided by SHORT, P.J., and RANDALL and AMUNDSON, JJ.

## OPINION

SHORT, Judge.

This criminal appeal involves the interpretation and construction of Minnesota's Racketeer Influenced and Corrupt Organizations Act (RICO), Minn.Stat. §§ 609.901–.912 (1990). A jury convicted Trong Kim Huynh (Huynh) of five counts of coercion in violation of Minn.Stat. § 609.27, subds.

1(2), 2(2) (1990) and one count of racketeering in violation of Minn.Stat. §§ 609.903, subd. 1, .904, subd. 1 (1990). The trial court sentenced Huynh to an executed term of 146 months. On appeal, he argues: (1) the state's evidence against him was insufficient as a matter of law; (2) the trial court improperly imposed separate sentences for the coercion offenses and the racketeering offense; and (3) the trial court abused its discretion in sentencing him. We affirm the convictions, but vacate the sentence and remand to the trial court for resentencing consistent with this opinion.

## FACTS

In August 1990, four men, including Huynh, visited the Perfume River Restaurant in Golden Valley. They demanded "protection payments" of $1,500 per month from the restaurant's owner ("victim"). Huynh told the victim he was a member of a gang, threatened the victim and his family, and told the victim to make out monthly checks payable to "Bin Trong" for protection. The victim decided to make the payments as directed because he felt threatened and fearful.

In September 1990, the victim wrote a check for $1,500 payable to Bin Trong and gave it to a waitress at his restaurant. At trial, the waitress testified as follows: (1) she gave Huynh the first $1,500 check when he came into the restaurant on September 10, 1990; (2) Huynh complained about getting a personal check and asked for money orders instead; (3) she observed three other men waiting in a car for Huynh when he came to the restaurant; and (4) Huynh picked up a second $1,500 check on October 10, 1990.

In early November 1990, Huynh called the victim and told him he wanted payment in money orders rather than personal checks. Later that month, Huynh came to the victim's restaurant. The victim advised Huynh he could not afford $1,500 per month and wanted to reduce his "protection" obligation to $1,000 per month. Huynh left the restaurant for a few minutes, then returned and agreed to accept the lesser amount. On November 13, 1990, the victim gave Huynh a $1,000 money order. Likewise, in December 1990 and January 1991, the victim made payments of $1,000 via money order.

Before the February 1991 payment was due, the victim called the Golden Valley police. He told the police about the protection scheme and gave them two license plate numbers of cars driven by the men visiting his restaurant as well as copies of his checks and money orders. The police staked out the February pick-up and arrested the man who picked up the check. In a post-arrest interview, the arrestee told the police: (1) a man named Trong had called him from California and told him to pick up the check; and (2) he had met Huynh at Coffman Union at the University of Minnesota and Huynh had sent him to pick up the check. The arrestee later testified at trial that he believed he was supposed to take the money order home and then bring it to Coffman Union.

The police traced the license numbers the victim had given them and discovered that one of the cars, a black B.M.W., belonged to Huynh's ex-girlfriend. At trial, the ex-girlfriend testified that Huynh was not employed during the fall of 1990 and didn't have to work because he received $700 per month from an unknown man.

An FBI agent testified at trial regarding his investigation of the cashing of the checks written by the victim and given to Huynh. The agent found the checks had passed through two supermarkets in Houston, Texas. One of the supermarkets was owned by a man named Bin Trong. The agent testified that the signature on Trong's Texas drivers' license appeared to match the endorsement signature on the checks.

An employee of First Bank, where the victim did his banking, also testified at trial. This employee identified two checks for $1,500 drawn on the victim's account payable to Bin Trong and stated that both of these checks had passed through banks in Houston. Similarly, a coordinator of money order processing for Travelers Ex-

press testified at trial regarding the tracing of the money orders. She identified three $1,000 money orders payable to Bin Trong dated November 13, 1990, December 10, 1990, and January 10, 1991, and testified that each money order had passed through a different institution in Texas.

An investigator with the Hennepin County Attorney's Office testified at trial as an expert regarding money laundering. He testified that: (1) money orders commonly are used in money laundering schemes because they are easily transferable; and (2) the use of money orders deposited in several different accounts and "rolled over" several times before ultimate deposit constitutes "basic money laundering."

The defense presented no witnesses. The jury found Huynh guilty of five counts of coercion in violation of Minn.Stat. § 609.-27, subds. 1(2), 2(2), and one count of racketeering in violation of Minn.Stat. §§ 609.-903, subd. 1, .904, subd. 1.

## ISSUES

I.   Was the evidence sufficient to support Huynh's conviction under Minn. Stat. §§ 609.903, subd. 1, .904, subd. 2 (1990)?

II.  Did the trial court properly impose separate sentences?

III. Did the trial court abuse its discretion in sentencing Huynh?

## ANALYSIS

### I.

In reviewing a claim of insufficiency of the evidence, we ascertain whether a jury reasonably could conclude the defendant was guilty of the offense charged. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). We view the evidence in the light most favorable to the verdict, and assume the jury believed the state's witnesses and disbelieved any contrary evidence. *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). The jury alone is to determine the credibility of the witnesses and resolve any conflicts in the testimony. *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988).

■ Huynh's appeal requires us to construe Minnesota's Racketeer Influenced and Corrupt Organizations Act (RICO), Minn.Stat. §§ 609.901–.912 (1990). The interpretation and construction of a statute is a question of law, and we need not defer to the trial court's interpretation. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984); *State v. Van Bus Delivery Co.*, 400 N.W.2d 759, 760 (Minn.App.1987). The object of all interpretation and construction of laws is to ascertain and effectuate the legislature's intent. Minn.Stat. § 645.16 (1992); *Tuma v. Commissioner of Economic Sec.*, 386 N.W.2d 702, 706 (Minn. 1986).

Like most state RICO statutes, Minnesota's RICO Act emulates the federal RICO Act. *Compare* 18 U.S.C. §§ 1961–68 (1990) (federal RICO Act) *with* Minn.Stat. §§ 609.-901–.912 (Minnesota RICO Act). *See generally* David R. McCormack, *Racketeer Influenced Corrupt Organizations* at 1–10 (1988) (discussing state RICO laws). Minnesota's statute is similar enough to the heavily litigated federal racketeering law that there is ample guidance in the federal case law for interpreting our statute.

RICO statutes are designed to address the large and pervasive problem of organized crime. *United States v. Turkette*, 452 U.S. 576, 586, 588, 101 S.Ct. 2524, 2530, 2531, 69 L.Ed.2d 246 (1981). Such statutes provide enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime. *Id.* at 589, 101 S.Ct. at 2532. However, RICO statutes were not intended to reach criminals who merely associate together and perpetuate any two or more of the predicate crimes; rather, such statutes are aimed at organized criminal activity. *United States v. Bledsoe*, 674 F.2d 647, 662 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). For this reason, a RICO conviction requires proof that the defendant was employed by or associated with a criminal enterprise. Minn.Stat. § 609.903; *Bledsoe*, 674 F.2d at 661, 663.

■ Huynh argues the state's evidence against him is insufficient to prove beyond a reasonable doubt that he was employed by or associated with a criminal enterprise. Minn.Stat. § 609.902, subd. 3 defines an "enterprise" as

a sole proprietorship, partnership, corporation, trust, or other legal entity, or a union, governmental entity, association, or group of persons, associated in fact although not a legal entity, and includes illicit as well as legitimate enterprises.

An enterprise is more than the predicate acts of racketeering. *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2529. When an alleged enterprise is coterminous with the predicate criminal acts alleged in the indictment, the RICO complaint may be dismissed. *Bledsoe*, 674 F.2d at 664. Similarly, an enterprise must be distinct from the person named as defendant. *See Bennett v. Berg*, 685 F.2d 1053, 1061–62 (8th Cir.1982) (civil RICO case), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). If the members of the enterprise are identical to the persons named as defendants, the RICO complaint may be dismissed. *Medical Inc. v. Angicor Ltd.*, 677 F.Supp. 1000, 1006 (D.Minn.1988) (civil RICO case).

■ Three characteristics distinguish a RICO enterprise: (1) there must be a common or shared purpose that animates the individuals associated with it; (2) there must be an ongoing organization whose members function as a continuing unit (in other words, there must be some continuity of structure and of personnel); and (3) there must be an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity. *United States v. Kragness*, 830 F.2d 842, 855 (8th Cir.1987) (quoting *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528); *Bledsoe*, 674 F.2d at 664–65; *see also United States v. Lemm*, 680 F.2d 1193, 1198 (8th Cir.1982) (a RICO enterprise must have a common or shared purpose, continuity of structure and personnel, and an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983). Proof of all three characteristics is necessary in order to ensure that criminal enterprises, which are RICO's target, are distinguished from individuals who associate for the commission of sporadic crime. *Kragness*, 830 F.2d at 855. Thus, we must examine the evidence as to each characteristic to determine whether the state proved Huynh was employed by or associated with a criminal enterprise within the meaning of the statute.

### a. Common or shared purpose

■ Proof of a common or shared purpose may be shown by evidence of an ongoing organization, formal or informal, of associates who function as a continuing unit. *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528; *Bledsoe*, 674 F.2d at 665. The record demonstrates: (1) Huynh was one of four men who visited the restaurant in August 1990; (2) Huynh and others participated in the five-month-long effort to obtain payments from the victim; and (3) Huynh told the victim that he was a member of a gang and the gang would enforce his threats against the victim and his family if protection payments were not made. This evidence shows that Huynh shared the common purpose with others of extracting protection payments from the victim, and that he was part of a group of associates who functioned as a continuing unit. Under these facts, the common-purpose characteristic has been shown.

### b. Continuity of structure and personnel

■ Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis. *Kragness*, 830 F.2d at 856. The determinative factor is whether the associational ties of those charged with racketeering amount to an organizational pattern or system of authority. *Id.* (quoting *Lemm*, 680 F.2d at 1199). Here, the record shows: (1) Huynh instructed the victim to make the protection payments by personal check, then three months later modified the instruction to require payments by money order; (2)

Huynh first denied the victim's request for a reduction in payments, then left the victim's restaurant, returned five to ten minutes later, and agreed to a reduction; (3) Huynh instructed the victim to make the checks and money orders payable to Bin Trong; (4) the checks passed through a Texas supermarket owned by Bin Trong and were deposited in different accounts; and (5) Huynh received $700 per month from an unknown man. This evidence establishes the existence of an organization or hierarchy directing the affairs of a group. Under these facts, the requisite continuity of structure and personnel has been demonstrated.

### c. Distinct structure

▮▮▮ An enterprise's distinct structure "might be demonstrated by proof that a group engaged in a diverse pattern of crimes or that it has an organizational pattern or system or authority beyond what was necessary to perpetrate the predicate crimes." *Bledsoe*, 674 F.2d at 665; *see also Kragness*, 830 F.2d at 857 (an enterprise "has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses") (quoting *United States v. Riccobene*, 709 F.2d 214, 223–24 (3rd Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983)). The record indicates: (1) Huynh told the victim he was a member of a gang; (2) Huynh said his gang would enforce his threats against the victim and the victim's family; (3) the victim's checks and money orders were deposited in several different accounts and "rolled over;" and (4) such a deposit scheme constitutes "basic money laundering." This evidence reveals that Huynh was not engaged simply in sporadic, ad hoc criminal activity. Under these facts, an enterprise's distinct structure has been demonstrated.

The state's evidence on each of the three characteristics of a RICO enterprise indicates Huynh's conduct constituted a pattern of the type of organized criminal activity RICO was designed to thwart. Accordingly, we conclude the state's evidence was sufficient to support the jury's conclusion that Huynh was employed by or associated with a racketeering enterprise within the meaning of Minnesota's RICO Act.

## II.

▮▮▮ Huynh argues the trial court improperly imposed separate sentences for five coercion offenses and one racketeering offense. *See* Minn.Stat. § 609.035 (1990) ("if a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses and a conviction or acquittal of any one of them is a bar to prosecution for any other of them"). The primary purpose of Minnesota's "double jeopardy" statute is to eliminate multiple prosecutions and punishments while permitting the state to punish criminals adequately. Note, *Multiple Prosecutions and Punishment of Unitary Criminal Conduct—Minn.Stat. § 609.035*, 56 Minn. L.Rev. 646, 651–52 (1972). If a defendant's multiple crimes against the same victim were committed as part of a single behavioral incident, the trial court properly can impose only one sentence. *State v. Hartfield*, 459 N.W.2d 668, 670 (Minn.1990). When one crime is committed with the intent of facilitating another or is but a means toward committing another, the offenses are part of a single behavioral incident. *Id.* at 670; *see State v. Matilla*, 339 N.W.2d 54, 55 (Minn.1983) (vacating sentence for offense of falsely reporting a crime because that offense was a part of single behavioral incident as offense of theft by swindle).

▮▮▮ Huynh's five coercion offenses were a means of sustaining the RICO enterprise and a means toward committing the RICO offense, as described in *Hartfield* and *Matilla*. Throughout late 1990 and early 1991, Huynh's criminal objective was the same: to coerce money from a single victim. Thus, under section 609.035, the trial court cannot sentence Huynh for both RICO and the coercion offenses unless the legislature specifically has exempted his crimes from the prohibition against multiple sentences for offenses committed as part of a single behavioral incident. *See*

Minn.Stat. § 609.035 (listing exceptions); *see also Hartfield,* 459 N.W.2d at 670 (sentences for both burglary and rape permissible).

Racketeering is not one of section 609.035's listed exceptions. However, like the burglary statute considered in *Hartfield,* Minnesota's RICO statute contains its own double jeopardy provision. Minn.Stat. § 609.910, subd. 1 provides that a criminal penalty imposed under Minnesota's RICO Act "does not preclude the application of any other criminal penalty or civil remedy for the separate criminal acts." This statute serves as a double jeopardy exemption for RICO violations. Thus, even though section 609.035 precluded sentencing Huynh for both the coercion offenses and the racketeering offenses, section 609.910 permitted the trial court to sentence Huynh for both the coercion offenses and the racketeering offense.

**III.**

■■■■■■ The trial court has great discretion in imposing a sentence, and as long as it is authorized by law, we will not disturb it. *State v. Kindem,* 313 N.W.2d 6, 7 (Minn.1981). Racketeering is not ranked in the Minnesota Sentencing Guidelines. Huynh argues the trial court abused its discretion in ranking racketeering as a severity level VIII offense because neither his particular conduct nor the characteristics of the racketeering offense are comparable to those of other crimes ranked at that level of severity. We disagree. Racketeering is an offense separately defined by the legislature. The penalties for racketeering are severe and are similar to those ranked as a severity level VIII offense. *Compare* Minn.Stat. § 609.904, subd. 1 (penalty for racketeering may be not more than 20 years imprisonment, fine of $1,000,000 or both) *with* Minn.Stat. § 609.221 (1990) (penalty for assault in the first degree may be not more than 20 years imprisonment, fine of $30,000 or both). In addition, Minnesota's RICO Act provides for significant forfeiture of the defendant's assets upon a conviction for racketeering. *See* Minn.Stat. § 609.905 (criminal forfeiture). Further, the Act exempts one convicted under it from the "double jeopardy" statute, section 609.035. *See* Minn.Stat. § 609.910, subd. 1 (remedy not exclusive). The legislature clearly intended to punish severely persons engaged in racketeering. *See Bledsoe,* 674 F.2d at 664 (RICO) imposes severe penalties on those who violate it. Under these circumstances, the trial court did not abuse its discretion in ranking racketeering at a severity level of VIII.

■■■■■■ Huynh also argues the trial court abused its discretion in using the *Hernandez* method to sentence him for racketeering after first sentencing him for three of the five coercion offenses. *See State v. Hernandez,* 311 N.W.2d 478, 481 (Minn. 1981) (in sentencing a convicted defendant on the same day for three convictions based on different offenses not part of the same behavioral incident or course of conduct and involving different victims, the trial court could consider the first two convictions in determining the defendant's criminal history score for the third conviction). We agree. Under *Hartfield,* the *Hernandez* method cannot be used to increase a defendant's criminal history score unless sentencing for more than one offense is permitted under section 609.035. *Hartfield,* 459 N.W.2d at 670; *see also* Christopher A.A. Jenssen, Developments, 18 Wm.Mitchell L.Rev. 212, 213 (1992) (discussing *Hartfield* ). Unless section 609.035 authorizes multiple sentencing, use of the *Hernandez* method unfairly exaggerates the criminality of a defendant's conduct. *Hartfield,* 459 N.W.2d at 670; *see also* William E. Falvey, *Defense Perspectives on the Minnesota Sentencing Guidelines,* 5 Hamline L.Rev. 257, 265–66 (1982) (discussing *Hernandez* ). Because sentencing Huynh for both racketeering and coercion was permissible under section 609.910 rather than under section 609.035, the trial court should not have used the *Hernandez* method. Rather, under the guidelines, the trial court should have sentenced Huynh first for the racketeering offense, yielding a criminal history score of 2 and a total prison term of 110 months.

We also note the trial court left the remaining two coercion offenses unsentenced and seemed to suggest it might adjust Huynh's sentence and impose a stiffer penalty on remand. We strongly disapprove of such remarks because they may discourage meritorious appeals. Minnesota law gives a criminal defendant an unconditional right to appeal from any sentence. Minn.Stat. § 244.11 (1992); *Ballweber v. State*, 457 N.W.2d 215, 217 (Minn.App. 1990). In addition, society has an interest in criminal appeals because they afford an added degree of protection against errors and irregularities in the criminal justice process. Gregory M. Dyer & Brendan Judge, Note, *Criminal Defendants' Waiver of the Right to Appeal—An Unacceptable Condition of a Negotiated Sentence or Plea Bargain*, 65 Notre Dame L.Rev. 649, 670 (1990). We remand the case for resentencing in accordance with our opinion.

## DECISION

Evidence is sufficient to establish the existence of an enterprise under Minnesota's RICO Act if the evidence shows a common or shared purpose, a continuity of structure and personnel, and an ascertainable structure distinct from that found in a pattern of racketeering. Under Minn.Stat. § 609.910, a trial court properly may impose sentences for both racketeering violations and the separate crimes constituting the RICO predicate acts. Ranking the offense of racketeering at severity level VIII is appropriate, but a trial court may not use the *Hernandez* method of calculating a defendant's criminal history score unless sentencing for multiple crimes is permissible under Minn.Stat. § 609.035.

**Convictions affirmed, but sentence vacated and remanded for resentencing.**

RANDALL, Judge, dissenting.

I respectfully dissent on the issue of whether the RICO conviction can stand on its own merits apart from the underlying offenses used to prove the five counts of coercion against appellant. I find the evidence is insufficient to sustain the conviction under the Minnesota Racketeer Influenced and Corrupt Organizations Act (RICO), Minn.Stat. §§ 609.901–.912 (1990).

A person is guilty of racketeering, as a separate and defineable offense apart from the underlying or predicate acts, if the person

is employed by or associated with an *enterprise* and intentionally conducts or participates in the affairs of the enterprise by participating in a pattern of criminal activity.

Minn.Stat. § 609.903, subd. 1(1) (1990) (emphasis added). An "enterprise" is defined as

a sole proprietorship, partnership, corporation, trust, or other legal entity, or a union, governmental entity, association, or group of persons, associated in fact although not a legal entity, and includes illicit as well as legitimate enterprises.

Minn.Stat. § 609.902, subd. 3 (1990).

The majority and I agree on the federal cases to examine for guidance. In *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court had occasion to define the term "enterprise" and to distinguish an enterprise from "a pattern of criminal activity." In holding that a wholly criminal enterprise could constitute an enterprise pursuant to RICO, the Court stated:

That a wholly criminal enterprise comes within the ambit of the statute does not mean that a "pattern of racketeering activity" is an "enterprise." In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. * * * *[An enterprise] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.* [A pattern of racketeering activity] is proved

by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. *The "enterprise" is not the "pattern of racketeering activity;" it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.*

*Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528–29 (emphasis added). Thus, to establish the enterprise the state must show something more than simply the predicate acts of racketeering. I do not find that "something more" in this case.

The enterprise must have a common or shared purpose, continuity of structure and personnel, and an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering. *See United States v. Kragness,* 830 F.2d 842, 855 (8th Cir.1987) (citing *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528); *United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983); *United States v. Bledsoe,* 674 F.2d 647, 664–65 (8th Cir.1982), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982).

I simply do not find the state proved, by proof beyond a reasonable doubt, the existence of a separate and distinct "enterprise," namely, an independent entity existing separately and distinctly from the pattern of criminal activity—the repeated coercion. RICO was intended to facilitate prosecution of people involved in true organized crime. *Turkette,* 452 U.S. at 586, 588–89, 101 S.Ct. at 2530, 2531–32; *Bledsoe,* 674 F.2d at 662 (*RICO not intended for prosecution of criminals who merely associate together and commit two or more of the specified crimes*).

By definition, whenever two or more people run afoul of Minnesota's conspiracy statute, Minn.Stat. § 609.175 (1990), and/or Minnesota's "aiding and abetting" statute,

Minn.Stat. § 609.05 (1990), you will have a small or large group of people planning a crime, what they will do when they get to the scene, and usually how they will get away and divide the proceeds. At oral argument, I asked the prosecutor whether, under Minnesota's RICO Act, whenever two or more people were convicted of committing three or more crimes (*see* Minn. Stat. § 609.902, subd. 6) together under Minnesota's aiding and abetting statute, would there always be a RICO violation as well. The prosecutor candidly answered, "Yes." I appreciate the candor. However, since both Minnesota and the federal government have for decades been able to prove people guilty of crimes by showing aiding and abetting, or otherwise conspiring, it has to be that the RICO statutes at both the federal and state level were not intended to be superfluous and redundant. The applicable federal cases, relied on by the majority as well as this dissent, set out the government's need to show an organized criminal enterprise, not just unofficial and unorganized cooperation by two or more people.

Here, the evidence relied upon by the state in determining there was an enterprise was as follows: appellant told the victim he was a member of a "gang" and the gang would enforce his threats; appellant modified the original instruction to the victim to pay by check by subsequently instructing the victim to pay by money order; appellant agreed to grant the victim's request for a reduction in payments after leaving the restaurant for five to ten minutes and then returning; and some of the money was laundered through a supermarket owned by a man named Trong.

This evidence is not sufficient to establish by proof beyond a reasonable doubt a distinct and definable enterprise apart from the acts of coercion at hand. The actual existence of a gang with a definitive separate structure apart from appellant's acts of coercion, and appellant's membership therein, were never proven. There were no organizational charts regarding the structure of a gang introduced into evidence. Nor was it proven there was some sort of

"enforcement arm" of a gang that would enforce appellant's threats if the victim failed to meet appellant's demands. The state did not prove a gang actually stood by ready to enforce the extortion demands. Furthermore, although appellant modified his instructions to the victim and the demands he made on the victim, the state did not prove he made those modifications based upon anyone's authority other than his own.

The evidence does show some of the money obtained by coercion was laundered. However, the evidence does not establish how it was laundered. More importantly, there is nothing in the record that would show the laundering of the money was anything more than a way for appellant to collect the proceeds from the coercions. That is, the evidence does not show appellant was associated with a money laundering organization distinct from appellant's acts with this one victim. Furthermore, the evidence does not show whether proceeds from other victims of coercion were being laundered in the same way. Although this fact, if established, would not necessarily be dispositive, it would be supportive of a finding of an enterprise in that it would go to show that this case involved "something more" than five separate acts of coercion by appellant.

As a separate element of a RICO crime, the state bears the burden of proving the existence of an enterprise. Although the facts here proven perhaps hint at the existence of an enterprise, suspicion can never substitute for proof beyond a reasonable doubt in a criminal case. The record does not prove anything other than appellant committed five separate coercions against a single victim. The fact some of the money was laundered establishes nothing more than the fact that the money taken away from the victim was laundered. The facts presented are not sufficiently linked in a way which shows the existence of a separate enterprise within the meaning of RICO.

I would reverse the RICO conviction for lack of evidence and remand for appropriate sentencing on the five individual coer-

cion accounts. Because I conclude the RICO offense cannot stand for lack of sufficient evidence, I do not address the issue of separate sentencing on the coercions and the RICO offense. I concur with the majority on the *Hernandez* issue.