STATE of Minnesota, Respondent,

v.

**Gary Allen KELLY, Appellant.**

**Nos. C5–92–1537, C7–92–1538.**

Court of Appeals of Minnesota.

Aug. 10, 1993.

Review Granted Sept. 30, 1993.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Linda M. Freyer, Asst. County Atty., Minneapolis, for respondent.

Lawrence W. Fry, Asst. State Public Defender, St. Paul, for appellant.

Considered and decided by NORTON, P.J., and PETERSON and AMUNDSON, JJ.

## OPINION

PETERSON, Judge.

This appeal involves interpretation of Minnesota's Racketeer Influenced and Corrupt Organizations Act (RICO), Minn.Stat. §§ 609.901–912 (1990). A jury convicted Gary Allen Kelly of six counts of soliciting prostitution in violation of Minn.Stat. § 609.322, subds. 1a(4)(a), 2(1), 2(4)(a) (1988), five counts of receiving profit derived from prostitution in violation of Minn. Stat. § 609.323, subds. 1a, 2 (1988), and one count of racketeering in violation of Minn. Stat. § 609.903, subd. 1(1) (1990). Kelly also pleaded guilty to one count of soliciting prostitution in violation of Minn.Stat. § 609.322, subd. 3(1) (1988). The trial court sentenced Kelly to an executed term of 153 months on the racketeering conviction and lesser concurrent terms on the prostitution offenses.

On appeal, Kelly argues: (1) the evidence was insufficient to support the racketeering conviction; (2) the trial court erred in imposing separate sentences for the prosti-

tution offenses and the racketeering offense; and (3) the trial court abused its discretion in sentencing him. We affirm the conviction and the sentence as modified.

## FACTS

The state presented its case against appellant Gary Allen Kelly through the testimony of eight juvenile girls who were either directly involved with Kelly or had personal knowledge of Kelly's prostitution activities.

I.B. testified that in the summer of 1989, when she was 16, she ran away from a group home with two other girls, T.L. and L.M. The three girls went to Minneapolis where they were introduced to Kelly. After promising to find them a place to stay, Kelly and another man, James Patten, took the girls to a motel in Minneapolis.

T.L. testified that at the motel, Kelly told the three girls he wanted them to make some money for him by sleeping with three men who were waiting outside. According to T.L., Kelly told L.M. that one of the men would give her $500 if she had sex with him. I.B. testified that Patten and Kelly demanded she have sex with the three men. When she refused, Kelly hit her, criticized her appearance and promised to buy her new clothes if she would prostitute herself. I.B. then had sex with each of the three men who paid Kelly and Patten for her services.

I.B. testified that she spent three to five days working as a prostitute for Kelly in Minneapolis. I.B. stated that Kelly brought her to specific apartments in the Cedar Square West Complex where she had sex with the men inside. According to I.B., Kelly would knock on the door to an apartment and ask the occupants if they wanted a girl. Kelly knew which apartments to go to because he had been to them before. The same pattern was repeated in Chicago where I.B. worked as a prostitute for appellant for two weeks. I.B. turned over all of the money she received for committing acts of prostitution to Kelly. She testified that Kelly instructed her to perform only certain services unless the customers talked to him and paid additional money.

I.B. testified that when Kelly talked to her about going to Chicago with him, Kelly said he was going to pick up some checks and that she would not have to prostitute herself there. According to I.B., when she refused to go with him, Kelly threatened to harm her or members of her family if she tried to run away. When I.B. did try to run away, Kelly became enraged and began hitting her.

A.D. testified that she ran away from home in August 1990 when she was 16 and went to Minneapolis where she met Kelly. Kelly brought A.D. to an apartment in Cedar Square where he had her commit two acts of prostitution in order to earn gas money for a trip to Chicago. Kelly told A.D. he was going to Chicago to pick up a check and promised to buy her something very expensive if she went with him. In Chicago, A.D. worked as a prostitute for Kelly for about a week. Kelly brought A.D. to apartment buildings where he knocked on doors and offered her services to the men inside. According to A.D., Kelly received all of the money she earned from prostitution.

R.H. testified that in October 1990, when she was 16, she ran away from home and went to live with Ronnie Nelson. While living with Nelson, she met Kelly. In December 1990, Kelly called R.H., offered to send her a bus ticket to Chicago and promised her money if she came to Chicago. R.H. recalled Kelly saying something about her working as a prostitute but did not remember if he said she would be working for him or for someone else.

D.L. testified that in January 1991, when she was 17, Herman Gordon called her and asked if she would go to Chicago with him to dance or engage in acts of prostitution. While she was talking to Gordon, Kelly got on the line and suggested she bring some girlfriends with her. D.L. and two friends, C.F. and S.W., left that evening for Minneapolis. C.F. testified that she understood they were going to Minneapolis to work as prostitutes for Kelly and Gordon.

According to D.L., when she and her two friends arrived at Gordon's apartment in Minneapolis, Kelly asked them if they wanted to come to Chicago to dance and to prostitute themselves. Kelly then telephoned some men whose numbers he had written down in a black book, one of whom came to the apartment and had sex with D.L. and S.W. The man paid Gordon and Kelly for the prostitution services.

D.L. testified that in Minneapolis, she worked as a prostitute for Gordon and DeAndre Suggs, S.W. worked for Kelly, and C.F. worked for Ronnie Nelson. C.F. testified that when she told Kelly she was going to work for Nelson instead of him, Kelly became angry and hit her. D.L. and C.F. testified that they went to Cedar Square with S.W. and Kelly. Kelly found customers by knocking on the doors to specific apartments and asking the occupants if they wanted a girl for a specified price. After about one week in Minneapolis, C.F. and S.W. went to Chicago with Kelly and Nelson. There, the pattern of Kelly taking the girls to specific apartments to engage in acts of prostitution was repeated. According to C.F., the customers usually paid Kelly directly. If she was paid, she had to turn the money over to Kelly or Nelson.

T.N. testified that she worked as a prostitute for Patten in Chicago in February 1991. During that time, she saw S.W. who was working as a prostitute for Kelly. According to T.N., she and S.W. went to apartment buildings and worked the street together.

D.A. testified that she met Kelly in February 1991, when she was 17. Kelly asked D.A. to go out with him and she accepted. That evening, Kelly talked to D.A. about working as a prostitute for him. He brought her to an apartment on Third Avenue South in Minneapolis. At the apartment, Kelly called a person whose number he had written down in a little black book. After the phone call, a man came to the apartment and D.A. had sex with the man for money. Kelly then brought D.A. to an apartment in Cedar Square West where she committed another act of prostitution.

D.A. testified that Kelly talked to her about going to Chicago to work as a prostitute for him. Kelly told D.A. that she would earn a lot of money and be able to buy expensive things.

## ISSUES

I. Was the evidence sufficient to support Kelly's conviction for racketeering?

II. Did the trial court properly impose separate sentences for the prostitution and racketeering convictions?

III. Did the trial court abuse its discretion in sentencing Kelly?

## ANALYSIS

### I.

■ When there is a challenge to the sufficiency of the evidence, this court's review is limited to a careful analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict they reached. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). We must assume the jurors "believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989).

■ However, statutory construction is a question of law subject to de novo review. *Whetstone v. Hossfeld Mfg. Co.*, 457 N.W.2d 380, 382 (Minn.1990). When construing a statute, our role "is to ascertain and effectuate the legislature's intent." *Tuma v. Commissioner of Economic Sec.*, 386 N.W.2d 702, 706 (Minn. 1986).

Minnesota's RICO Act provides:

A person is guilty of racketeering if the person:

is employed by or associated with an enterprise and intentionally conducts or participates in the affairs of the enterprise by participating in a pattern of criminal activity.

Minn.Stat. § 609.903, subd. 1(1) (1990). An enterprise is defined as

a sole proprietorship, partnership, corporation, trust, or other legal entity, or a union, governmental entity, association or group of persons, associated in fact although not a legal entity, and includes illicit as well as legitimate enterprises.

Minn.Stat. § 609.902, subd. 3 (1990).

Kelly argues there was insufficient evidence to prove he was employed by or associated with an enterprise. The state argues the evidence that Kelly operated and controlled a prostitution business supports his conviction under RICO. The state's position is based on Kelly's maintaining contacts with customers and employing teenage girls to work as prostitutes for him, not on the association between Kelly and his codefendants.

■ Minnesota's RICO Act is similar to the federal RICO Act. *Compare* Minn. Stat. §§ 609.901–.912 (1990) (Minnesota RICO Act) *with* 18 U.S.C. §§ 1961–68 (1988 & Supp. III 1991) (federal RICO Act). When interpreting a state statute patterned after a federal statute, federal cases interpreting the federal statute are generally instructive. *Donovan Contracting, Inc. v. Minnesota Dep't of Transp.*, 469 N.W.2d 718, 719 (Minn.App.1991), *pet. for rev. denied* (Minn. Aug. 2, 1991); *see also State v. Huynh*, 504 N.W.2d 477, 481 (Minn.App.1993) (relying on federal caselaw in construing Minnesota's RICO Act).

■ To establish the existence of a RICO enterprise, the state must prove:

(1) There is a common or shared purpose among the individuals associated with the enterprise;

(2) There is an ongoing organization whose members function as a continuing unit or, in other words, there is some continuity of structure and personnel; and

(3) There is an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity.

*Huynh*, 504 N.W.2d at 482; *United States v. Kragness*, 830 F.2d 842, 855 (8th Cir. 1987) (citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981)). Although an "enterprise" is distinct from "the pattern of racketeering activity," "the proof used to establish these separate elements may in particular cases coalesce." *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528–29.

*Common or shared purpose*

■ In *Turkette*, the Supreme Court stated:

The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct.

*Id.*, 452 U.S. at 581, 101 S.Ct. at 2528. The state presented evidence that Kelly associated with teenage girls who worked as prostitutes for him and with specific customers who used the prostitutes' services. These individuals associated together for the purpose of participating in the operation of a prostitution business. This evidence is sufficient to establish the common-purpose element. *See id.* at 579, 101 S.Ct. at 2526–27 (indictment charging defendant with RICO offense for which he was convicted described enterprise as group of individuals associated together for purpose of illegal drug trafficking, committing arson, mail fraud, bribery and corruptly influencing court proceedings); *Kragness*, 830 F.2d at 856 (common-purpose element present where each defendant shared common purpose of importing, receiving, concealing, buying, selling and otherwise dealing in illegal drug trafficking).

*Continuity of structure and personnel*

■ The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528.

Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis.

*Kragness*, 830 F.2d at 856. The individuals associated with the enterprise may change over time provided the enterprise exhibits

"a pattern of roles and a continuing system of authority." *Id.* at 856–57.

The state presented testimony about various specific incidents that occurred during the time period from the summer of 1989 through February 1991. There was evidence that Kelly: (1) recruited and employed teenage girls to work as prostitutes for him; (2) maintained contacts with customers; and (3) directed and controlled the operation's affairs. The evidence was sufficient to show Kelly operated the prostitution business on a continuing rather than ad hoc basis. Although the individuals working as prostitutes and possibly those using the prostitutes' services changed over time, the pattern of roles and system of authority remained constant. Under these facts, the continuity requirement was satisfied.

### Distinct structure

■ In order to demonstrate the existence of an ascertainable structure distinct from the pattern of racketeering activity,

it is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity * * * but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses.

*Id.* at 857 (quoting *United States v. Riccobene,* 709 F.2d 214, 223–24 (3rd Cir.1983), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983).

The record shows Kelly used promises of gifts and financial reward, deception, violence, and threats of violence to maintain his organization. This evidence demonstrates the existence of an enterprise beyond that necessary to commit the predicate prostitution offenses. Also, Kelly's maintaining contacts with clients was not necessary to support the underlying prostitution convictions.

We hold the evidence was sufficient to support the jury's determination that Kelly was associated with an enterprise within the meaning of Minnesota's RICO Act.

## II.

Generally,

if a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses.

Minn.Stat. § 609.035 (1990). The purpose of section 609.035 is to promote "the policy underlying the constitutional protection against double jeopardy * * * by limiting the sentence to the maximum permitted for the most serious crime committed." Minn. Stat.Ann. § 609.035 Maynard E. Pirsig cmt. (West 1987). The statute "prohibits multiple sentences, even concurrent sentences, for two or more offenses that were committed as part of a single behavioral incident." *State v. Norregaard,* 384 N.W.2d 449, 449 (Minn.1986).

■ Although racketeering is not one of the exceptions listed in section 609.-035, Minnesota's RICO Act contains its own double jeopardy provision. A punishment imposed for a conviction under Minn. Stat. § 609.903 "does not preclude the application of any other criminal penalty * * * for the separate criminal acts." Minn.Stat. § 609.910, subd. 1. Given this provision, the trial court properly imposed separate sentences for the prostitution offenses and the racketeering offense. *See Huynh,* 504 N.W.2d at 484 (Minn.Stat. § 609.10 allowed sentences to be imposed for both RICO violation and underlying offenses); *see also State v. Hartfield,* 459 N.W.2d 668, 670 (Minn.1990) (because burglary statute specifically allows sentencing for burglary and offense committed during burglary, permissible to sentence defendant for both offenses even though they were committed as part of single behavioral incident); *Kragness,* 830 F.2d at 864 (imposing separate sentences for federal RICO conviction and underlying drug conspiracies does not violate double jeopardy clause because federal RICO Act specifically provides for imposition of separate sentences).

## III.

■ Sentencing is committed to the trial court's broad discretion, and its decision will not be reversed absent an abuse of discretion. *State v. Kindem,* 313

N.W.2d 6, 7 (Minn.1981). Kelly argues the trial court erred in assigning a severity level VIII to his racketeering conviction. Racketeering is not ranked in the Minnesota Sentencing Guidelines. When a person is sentenced for an unranked offense, the trial court has discretion to assign an appropriate severity level to the offense. Minn.Sent. Guidelines, cmt. II.A.05.

Kelly argues his racketeering offense was no more serious than his most serious prostitution offense, a severity level V offense, and, therefore, should not have been assigned a severity level greater than V. We disagree. The maximum penalty for Kelly's most serious prostitution offense was 10 years imprisonment. Minn.Stat. § 609.322, subd. 1a (1988). The maximum penalty for racketeering is 20 years imprisonment. Minn.Stat. § 609.904, subd. 1 (1990). This shows the legislature intended racketeering to be a more serious offense.

Under the guidelines in effect when Kelly was sentenced, the most serious prostitution offenses were assigned a severity level VIII and carried a maximum penalty of twenty years. *See* Minn.Sent. Guidelines V (1992) (assigning severity level VIII to convictions under Minn.Stat. § 609.322, subd. 1 and Minn.Stat. § 609.324, subd. 1(a)); Minn.Stat. § 609.322, subd. 1 (1990) (soliciting or promoting prostitution of individual under age 13–20 years); Minn.Stat. § 609.324, subd. 1(a) (1990) (engaging in prostitution with individual under age 13 or hiring or agreeing to hire individual under age 13 to engage in sexual penetration or sexual contact—20 years). Given the facts underlying Kelly's racketeering conviction, the trial court did not abuse its discretion in assigning severity level VIII to this offense in this case.

■ The parties agree the trial court erred in sentencing Kelly to 57 months in prison for his conviction of promoting the prostitution of S.W. The record shows the trial court intended to sentence Kelly to the presumptive guidelines sentence for the conviction. With a criminal history score of three, the presumptive guidelines sentence for a severity level V offense was 30 months. We, therefore, reduce Kelly's sentence for the prostitution conviction involving S.W. from 57 months to 30 months.

■ In its brief, the state challenges the trial court's calculation of Kelly's sentences for various other counts. Because the state did not appeal from the sentence, we decline to consider the issues raised in its brief. *See State v. Schanus*, 431 N.W.2d 151, 152 (Minn.App.1988) (state's challenge to sentence barred where it filed notice of review instead of appealing pursuant to Minn.R.Crim.P. 28.04); *State v. Marshall*, 411 N.W.2d 276, 281 (Minn.App.1987) (court declined to consider sentencing issue raised in state's brief because state did not appeal pursuant to Minn.R.Crim.P. 28.04), *pet. for rev. denied* (Minn. Oct. 26, 1987).

## DECISION

The evidence supports Kelly's conviction for racketeering. The trial court properly imposed separate sentences for the racketeering offense and the predicate prostitution offenses. The trial court did not abuse its discretion in assigning a severity level VIII to the racketeering offense. Kelly's sentence for the prostitution conviction involving S.W. is reduced from 57 months to 30 months.

**Affirmed as modified.**