DIAMONDS PLUS, INC., Appellee,

v.

Larry KOLBER; The Mike James Mortgage Company; Michael J. James;

Frank T. Holland; Frank T. Holland & Company, Appellants.

No. 91–2167.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 8, 1992.

Decided April 6, 1992.

Frank T. Holland, pro se.

Denzil Keith Blackman, Jonesboro, Ark., for appellee.

Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Frank Holland and Frank T. Holland & Company (collectively referred to as "Holland")[1] appeal the district court's[2] finding of liability under the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO). We affirm.

## I. BACKGROUND

Frank Shaver and his wife, Paula, are the owners and officers of Diamonds Plus, Incorporated. Diamonds Plus sells jewelry at two retail locations in Arkansas, and Paula conducts most of the business for Diamonds Plus. While travelling in December 1987, Frank saw an advertisement for financial services in a copy of *U.S.A. Today*. The advertisement advised that "immediate financing" could be obtained "through the offices of Frank T. Holland" and provided a telephone number for Holland's office in Houston, Texas. Frank called the number and spoke briefly with Holland. Because he was less familiar

---

**1.** "Frank T. Holland & Company" does not appear to be a separate entity; rather, it appears to be a business designation for Frank Holland.

**2.** The Honorable Stephen M. Reasoner, Chief Judge, United States District Court for the Eastern District of Arkansas.

with the details of Diamonds Plus' financial situation, Frank suggested that Paula call Holland at a later time. Paula called Holland on December 29, 1987 and provided him with some preliminary information about the Shavers' business. She called Holland again two or three weeks later; at that time, Holland told her that time was of the essence and in order to get the process started she had to come to Houston for a meeting. On January 24, 1988, Paula and Diamonds Plus' assistant manager, Selenia Chunn, went to Houston. They met Holland in a hotel restaurant; Holland was accompanied at the meeting by Quimet Peterson, whom Holland introduced as the individual who would actually procure the loan. Paula gave Holland the paperwork he had requested and paid him a "consultation fee" of one thousand dollars. Peterson and, to a, lesser extent, Holland, explained what Diamonds Plus had to do to obtain the financing it sought. At the conclusion of the meeting, Holland instructed Paula to call him upon her return to Arkansas and arrange for an on-site inspection of Diamonds Plus. None of the representatives of Diamonds Plus saw or spoke with Peterson again.

Upon her return home, Paula called Holland to arrange the inspection and sent him a $2,250 fee. The inspection was performed by Larry Kolber; the Shavers picked Kolber up at the Memphis airport, showed him the two retail locations, spoke with him, and took him back to the airport. During their conversations, Kolber expressed excitement over the prospect of working with the Shavers and pleasure over the fact that Holland had sent him to inspect Diamonds Plus. He also identified what things had to be done and what documents had to be provided in order for Diamonds Plus to obtain a loan. The documents Kolber identified were to be sent to him in New Orleans.

Paula and Kolber spoke many times during the following two months. Kolber indicated the best prospect for Diamonds Plus to obtain financing might involve a second mortgage on the Shavers' home. He indicated that such a financing arrangement could be worked out through the Mike James Mortgage Company, which was located in Florida. Kolber instructed Paula to send certain documents to Mike James and $3,000 to Holland to secure the mortgage. As early as the beginning of March, 1988, Paula was told by both Kolber and Holland that Diamonds Plus had been approved for financing.

Diamonds Plus never received the loan proceeds. Repeated attempts by the Shavers to contact Kolber and James failed, although Holland did return the $3,000 Paula sent him in March. Diamonds Plus filed suit against Holland, Kolber, James, and Mike James Mortgage Company under the civil provisions of RICO, 18 U.S.C. § 1964(c) (1988). James and Mike James Mortgage Co. were served but did not appear at trial, and Kolber was never served. Immediately prior to trial, the district court reconsidered its earlier decision that the deposition of one of Holland's employees, Leo Stakemiller, was admissable; upon reconsideration, the court concluded the deposition was inadmissible because Holland had not received proper notice of the deposition and, for that reason, had not attended Stakemiller's deposition. Holland also requested the court reconsider its decision denying summary judgment in his favor, but the court did not discuss this motion prior to trial. After trial, the district court found in favor of Diamonds Plus,[3] and Holland appeals.

## II. DISCUSSION

### A. Summary Judgment

█ Holland contends the district court should not have relied on Stakemiller's deposition in ruling on the motion for summary judgment because the deposition was inadmissible at trial. However, a deposition need not be admissable at trial in order to be properly considered in opposition to a motion for summary judgment. The Fed-

---

3. The court found Diamonds Plus had suffered damages in the amount of $4,148.23. These damages were then trebled as required by 18 U.S.C. § 1964(c), resulting in a total damage award of $12,444.69.

eral Rules specifically allow depositions to be used in opposition to motions for summary judgment, Fed.R.Civ.Pro. 56(e), and "[a] deposition is at least as good as an affidavit and should be usable whenever an affidavit would be permissible, even though the conditions of the rule on use of a deposition at trial are not satisfied." Wright & Miller, Federal Practice and Procedure § 2142 (1970) (footnote omitted); *see also Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 966–67 (9th Cir.1981). We have examined Stakemiller's deposition and find it raises sufficient questions of material fact to prevent entry of summary judgment in Holland's favor.

■ Holland concedes that, under certain circumstances, a deposition that is inadmissable at trial might qualify as an affidavit for purposes of supporting or opposing a motion for summary judgment. He contends, however, that Stakemiller's deposition fails to qualify as an affidavit because it was not signed and notarized. We decline to address this issue because it was raised for the first time on appeal; we generally do not discuss issues that are not raised initially before the district court, *Jones v. Lockhart*, 851 F.2d 1115, 1116 (8th Cir.1988) (per curiam), and Holland's argument at this late stage in the proceedings has not been made with the "reasonable promptness" required by the Federal Rules. Fed.R.Civ.Pro. 32(d)(4).

### B. Sufficiency of the Evidence

RICO provides a civil cause of action to those who are injured by activities violative of 18 U.S.C. § 1962 (1988). 18 U.S.C. § 1964(c) (1988) provides for "threefold damages and costs, including a reasonable attorney's fee." Section 1962(c) prohibits any person "associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." A pattern of racketeering ac-

tivity requires two or more violations of certain specified state or federal crimes, *id.* § 1961(5), including wire fraud and mail fraud. *Id.* § 1961(1).

Holland contends there was insufficient evidence to support the court's findings that he acted with intent to defraud as required by the statutes governing mail and wire fraud,[4] that he engaged in a pattern of racketeering activity, or that an enterprise within the meaning of RICO existed. We review the district court's findings for clear error. *E.g., Patterson v. Masem*, 774 F.2d 251, 256 (8th Cir.1985).

### 1. Intent to Defraud

Diamonds Plus alleged that Holland had committed the predicate acts of wire and mail fraud. Holland does not dispute he used the mail and the telephone to conduct his activities, but contends he lacked the requisite intent to defraud because he possessed a good faith belief that he could provide financing to his prospective customers.

■ "The crime of mail fraud is broad in scope and its fraudulent aspect is measured by a nontechnical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play." *Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986, 991 (8th Cir.1989). No single fact need demonstrate the defendant's intent; rather, intent to defraud can be discerned by examining the totality of the circumstances surrounding the defendant's activities. *Id.* Intent to defraud need not be evinced by the defendant's avowed intent to bilk members of the public; it can also be demonstrated when the defendant recklessly disregards whether his representations are true. *E.g., United States v. Henderson*, 446 F.2d 960, 966 (8th Cir.), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971).

---

4. The statutory language contained in the mail fraud statute, 18 U.S.C. § 1341, and the wire fraud statute, 18 U.S.C. § 1343, are sufficiently similar to allow cases construing one statute to apply to both statutes. *United States v. Begnaud*, 783 F.2d 144, 148 n. 6 (8th Cir.1986). Henceforth, the two statutes will be referred to collectively as "mail fraud."

■ The district court found that Holland placed advertisements in numerous newspapers, including two national newspapers: *U.S.A. Today* and *The Wall Street Journal*. These advertisements represented that Holland was able to provide immediate commercial financing. However, Holland had no prior experience in providing financing of any kind, had no sources for such financing at the time he placed the ad, and was never able to provide financing to any of the people responding to his ads. In fact, *U.S.A. Today* stopped printing Holland's ad because the newspaper had received too many complaints about Holland, yet Holland continued to advertise in other publications after *U.S.A. Today* notified him of the complaints.

Holland contends he had a good faith belief he could obtain financing because Peterson told him he had access to various private and commercial lenders. However, Peterson never disclosed the identity of these lenders, and there is no indication that such lenders actually existed. Under these circumstances, the district court was entitled to find that Holland recklessly disregarded the truth of his advertisements' representations and thereby acted with intent to defraud; the district court's refusal to accept Holland's testimony as to his good faith constitutes a reasonable interpretation of conflicting evidence which cannot constitute clear error. *E.g., Perfetti v. Commissioner*, 762 F.2d 638, 640 (8th Cir. 1985).

### 2. Existence of a Pattern

■ RICO defines a "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity" occurring within certain time frames. 18 U.S.C. § 1961(5) (1988). However, this is only a minimum requirement, *H.J. Inc. v. Northwestern Bell Tele. Co.*, 492 U.S. 229, 238, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989); the concept of a "pattern" requires proof "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. at 2900 (emphasis in original). A relationship between predicate acts exists when the acts are similar in method, purpose, and result. *First National Bank & Trust Co. v. Hollingsworth*, 931 F.2d 1295, 1304 (8th Cir.1991). Continuity may be demonstrated "by proving a series of related predicates extending over a substantial period of time." *H.J.*, 492 U.S. at 242, 109 S.Ct. at 2902. Continuity also exists if "the predicate acts or offenses are part of an ongoing entity's regular way of doing business," thereby constituting a threat of causing continuous harm in the future. *Id.* at 242–43, 109 S.Ct. at 2902–03. Ultimately, the existence of a pattern is a question of fact. *Terry A. Lambert Plumbing v. Western Security Bank*, 934 F.2d 976, 980 (8th Cir.1991).

■ Holland's argument does not address the relatedness prong of the pattern requirement; instead, he contends the only predicate acts proven were those relating to Diamonds Plus. From this, Holland reasons that proof of continuity was lacking. We disagree with Holland's initial premise: the predicate acts involved Holland placing advertisements in national publications alleging he had immediate access to commercial financing. These advertisements induced people to call him by phone, at which time Holland or a member of his office staff would reinforce the advertisement's representations and ask the callers to mail certain information to Holland's office. There was evidence that in an approximately two year span, between 125 and 350 people flew to Houston to meet with Holland and Peterson—and paid one thousand dollars each for Holland's "services"—yet none of these people were provided with financing. The district court's conclusion that this constituted a "pattern of racketeering activity" is clearly correct and does not remotely approach being clearly erroneous.

### 3. Existence of an Enterprise

■ In *Atlas Pile Driving*, this court reiterated "that a RICO enterprise must exhibit three basic characteristics: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from

that inherent in a pattern of racketeering." 886 F.2d at 995. Holland's argument on appeal centers on the third element. In *United States v. Bledsoe*, 674 F.2d 647 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982), we clarified the "distinct structure" requirement as follows:

> Th[e] distinct structure might be demonstrated by proof that a group engaged in a diverse pattern of crimes or that it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes. The command system of a Mafia family is an example of this type of structure as is the hierarchy, planning, and division of profits within a prostitution ring.

*Id.* at 665. The focus of the inquiry is whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense. The facts used to support the predicate offenses may be considered when conducting this inquiry. *United States v. Leisure*, 844 F.2d 1347, 1363 (8th Cir.), *cert. denied*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988).

■ The facts in this case demonstrate the enterprise is separate and distinct from the predicate acts because the enterprise contained an "organizational pattern ... beyond what was necessary to perpetrate the predicate crimes," *Bledsoe*, 674 F.2d at 665. Holland placed ads listing his name and his law office's phone number in order to entice potential borrowers into calling, and utilized his office staff to insure the phones were answered. This caused loan applicants to perceive Holland as the person in charge, even though Holland deferred to Peterson's judgment as to how far to proceed with each individual loan applicant. Thus, a complicated organizational pattern was established: publicly, Holland was in charge; in reality, Peterson controlled much of the operations. Peterson made arrangements for Kolber to perform on-site inspections for the enterprise, and Holland apparently contacted Kolber

when an inspection needed to be performed. For their joint efforts, Holland and Peterson split all the profits, with Kolber receiving a share of the fee applicants paid to have the inspection performed.

■ Holland contends the enterprise had no structure independent from the alleged pattern of racketeering because the enterprise engaged in no lawful or non-racketeering activity. This argument was rejected in *United States v. Kragness*, 830 F.2d 842 (8th Cir.1987), wherein we noted that it was " 'not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity....' " *Id.* at 857 (quoting *United States v. Riccobene*, 709 F.2d 214, 223–24 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983)).[5] Holland's argument is also flawed in that he insists there be some proof of lawful activity on the part of the enterprise; this requirement was rejected in *United States v. Lemm*, 680 F.2d 1193, 1197–98 (8th Cir. 1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983). After reviewing the record, we are convinced the enterprise found to exist by the district court was not "an instance of a sporadic and temporary criminal alliance to commit one of the enumerated RICO crimes." *Id.* at 1201. Hence, we find no error in the district court's determination.

## III. CONCLUSION

The district court properly denied summary judgment in favor of Holland because Stakemiller's deposition, though inadmissable at trial, constituted the equivalent of an affidavit and created issues of fact that made summary judgment inappropriate. The district court did not commit clear error when it concluded that Holland acted with intent to defraud, that Holland had committed a pattern of racketeering activity, or that Holland was a member of an

5. We hasten to point out that, though it is not required, proof the enterprise conducts lawful activity unrelated to the pattern of racketeering will often serve to prove the enterprise is sepa-

rate from the pattern of racketeering. *E.g., United States v. Lemm*, 680 F.2d 1193, 1201 (8th Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983).

enterprise within the meaning of RICO. Therefore, we affirm the district court.