STATE of Minnesota, Respondent,

v.

Trong Kim HUYNH, Petitioner, Appellant.

No. C6–92–1935.

Supreme Court of Minnesota.

June 30, 1994.

Rehearing Denied Aug. 11, 1994.

John M. Stuart, State Public Defender, Lawrence Hammerling, Deputy State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Paul R. Scoggin, Asst. County Atty., Minneapolis, for respondent.

## OPINION

SIMONETT, Justice.

In this case we consider what constitutes an "enterprise" under Minn.Stat. § 609.903, subd. 1(1) (1992), known as Minnesota's Racketeer Influenced and Corrupt Organizations Act (RICO). We affirm defendant's conviction for racketeering, and we also affirm the trial court's ranking the offense of racketeering at severity level VIII for sentencing purposes.

The victim in this case, Hung Huynh (no relation to the defendant), came to the United States from Vietnam in 1979. He and his wife opened a restaurant in Golden Valley. In August 1990, defendant-appellant Trong Kim Huynh and three other men appeared at the restaurant and told Hung Huynh that he must pay them $1,500 a month, beginning on September 10, or "they" would kill him and his family. Defendant told Hung to pay with a money order made out to "Bin Tong Trong" and to write on the money order the words "lost football." Hung did not know anyone named Bin Tong Trong and he did not have any gambling debts. Hung recorded the license number of the car in which the four men drove away.

A few days before September 10, Hung received a telephone call. The caller identified himself as a member of an Asian gang and told Hung that if he did not make the payment the "gang" would kill him and his family. On September 10, 1990, Hung made his first payment of $1,500 by personal check payable to "Truong Binh Tong," giving the check to his restaurant employee, Phuong Phan, for delivery to defendant. At trial, Phan testified that on three occasions defendant Huynh came to the restaurant and she gave him the payment. On each occasion, defendant entered the restaurant alone, but more than once Phan saw three other people leave with Huynh in the car.

On October 10, 1990, defendant Huynh picked up a second personal check for $1,500. On November 8 or 9, defendant called Hung and told him to pay by money order. When defendant came to the restaurant on November 13, Hung told defendant he could not afford to pay $1,500 and offered defendant a money order for $1,000. Defendant left the restaurant for 5 or 10 minutes and then returned and accepted the money order, made out to Tong Bin Trong and similarly bearing the words "lost football."

Again in December and in January Hung received a call from defendant Huynh and handed over a $1,000 money order each time. On February 8, 1991, after receiving a call from defendant, Hung informed the Golden

Valley police about the threats and payments. The police set up surveillance and on February 13 arrested Son Thanh Tran, who had come to the restaurant to pick up the payment. Tran told police in a post-arrest interview that "a party he knew as Trong" (one of the aliases used by defendant Huynh) had called him from California, asked him to pick up the monthly payment, and said someone would get the payment from him later. Tran was granted immunity, but at trial his memory "failed," and he testified he did not know defendant and could not recall the name of the person who called him from California.

The license number written down by Hung was traced to a vehicle owned by Lam Phuong Tran. She testified that she and defendant had been living together, and that defendant, who was unemployed, would often use her car. She also testified that defendant received $700 a month but that he did not tell her what the money was for or from whom he received it.

An FBI agent investigated the check cashings. One of the checks passed through a Vietnamese grocery store owned by Thong Hoi Quach in Houston, Texas. The agent interviewed Trong Bin Tong, who owned another grocery store in Houston, and testified that the signature on Tong's driver's license was very similar to the endorsement on the checks. An officer at First Bank Minneapolis identified the personal checks written on Hung's account and payable to "Truong Binh Tong." The first of these, for $1,500 with the notation "lost football," was presented on September 27, 1990, at Common Law Federal of Houston, Texas, possibly by a third party to whom the check was signed over. The second check, for the same amount and with the same notation, was endorsed over to the Vietnam Saigon Supermarket, which presented it for payment in October 1990 at Texas First National of Houston.

A representative of Travelers Express Company testified about the three First Bank money orders for $1,000 made out to "Truong Binh Tong." The first, dated November 13, 1990, was signed over to Fullton Seafood and then deposited in a Texas bank. The second, dated December 10, 1990, was signed over to Domino Bi–Da Sports Bar and deposited in a Texas bank. The third, dated January 10, 1991, was endorsed "Paitoon Vanapha" and presented at a Texas bank.

Finally, an investigator with the Hennepin County Attorney's Office testified as an expert on money laundering. He stated that money orders are preferred to personal checks because they are less traceable, easily transferred, and can be cashed just about anywhere, usually without a request for identification. Given a hypothetical in which an individual is told to get money orders all payable to the same payee, which are then endorsed by various entities and deposited into different accounts, the investigator stated this would be basic money laundering.

The defense presented no witnesses.

Defendant Huynh was convicted of five counts of coercion under Minn.Stat. § 609.27, subd. 1(1) (1992)[1] and one count of racketeering under Minn.Stat. § 609.903, subd. 1(1). The trial court sentenced defendant to concurrent terms, for a maximum 146–month commitment to the Commissioner of Corrections. Defendant appealed the racketeering conviction, but the court of appeals, one judge dissenting, affirmed the conviction. As to the sentencing, the court of appeals agreed with the trial court's ranking of racketeering at a severity level VIII but remanded for resentencing, ruling the trial court should not have used the *Hernandez* method of calculating the criminal history score.[2] *State v. Huynh*, 504 N.W.2d 477 (Minn.App. 1993). We granted defendant's petition for further review.

---

1. Minn.Stat. § 609.27, subd. 1(1) (1992) provides that one is guilty of coercion when one "causes another against the other's will to do any act or forbear doing a lawful act" by making a "threat to unlawfully inflict bodily harm upon, or hold in confinement, the person threatened or another, when robbery or attempt to rob is not committed thereby."

2. *State v. Hernandez*, 311 N.W.2d 478 (Minn. 1981).

## I.

Defendant argues that "as a matter of law" the evidence fails to prove beyond a reasonable doubt the commission of a racketeering offense. Discussion of this issue raises, first, a question of law as to the elements that must be proved to constitute a racketeering "enterprise."

■ A person is guilty of racketeering if the person is "employed by or associated with an enterprise and intentionally conducts or participates in the affairs of the enterprise by participating in a pattern of criminal activity." Minn.Stat. § 609.903, subd. 1(1).

■ Our attention in this case is on what constitutes an "enterprise." The statute defines an enterprise as "a sole proprietorship, partnership, corporation, trust, or other legal entity, or a union, governmental entity, association, or group of persons, associated in fact although not a legal entity, and includes illicit as well as legitimate enterprises." Minn.Stat. § 609.902, subd. 3 (1992). Minnesota's RICO statute is much like the federal RICO law; consequently, in construing our statute it is helpful to consider the federal courts' interpretation of the federal Act. While both the federal and state RICO statutes define "enterprise" simply as a particular type of entity (such as a corporation or association in fact),[3] federal case law supplements this definition by identifying certain characteristics the entity must have.

The leading decision is *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). There the United States Supreme Court ruled that the existence of an "enterprise" and the "pattern of criminal activity" are two separate elements to be proven. *Id.* at 583, 101 S.Ct. at 2528. An enterprise, according to *Turkette*, requires proof that a group of persons is associated together as an "ongoing organization"; the "pattern of racketeering activity," on the other hand, requires a series of criminal predicate acts. *Id.* Proof of these two elements, said the Court in *Turkette*, may at times "coalesce,"

*i.e.,* in some cases the same proof may be used to prove both elements. *Id.*

The federal courts of appeal, however, have disagreed on whether, in addition to an ongoing organization and a pattern of racketeering activity, a further element is required to prove an enterprise. Some federal courts say only the two elements need be proven because that is all the statute requires. Indeed, because proof of the two elements tends to coalesce, it has been said that an enterprise is, "in effect, no more than the sum of the predicate racketeering acts." *United States v. Bagaric*, 706 F.2d 42 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). Other federal courts, including the Eighth Circuit, have concluded otherwise. *See generally* David Vitter, Comment, *The RICO Enterprise as Distinct from the Pattern of Racketeering Activity: Clarifying the Minority View*, 62 Tul.L.Rev. 1419, 1424–29 (1988) (setting out the split in federal case law).

In *United States v. Bledsoe*, 674 F.2d 647, 664 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982), the Eighth Circuit reasoned that a RICO enterprise "cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts." Something more is needed. Otherwise, every time two individuals commit several criminal acts there would be an offense of racketeering. *Id.* Therefore, said *Bledsoe*, "the inclusion of the enterprise element requires proof of some structure separate from the racketeering activity and distinct from the organization which is necessarily incident to the racketeering * * *." *Id.* More recently, in *United States v. Kragness*, 830 F.2d 842, 855 (8th Cir.1987), the Eighth Circuit set out a three-part test for a RICO enterprise, requiring a common purpose, continuity, and "an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity."

The State takes the position that there is no need for a *Bledsoe*-type "distinct structure" requirement. As we understand it, the

---

**3.** "Enterprise" is defined by 18 U.S.C. § 1961(4) (1988) as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

State's argument is that if the enterprise involves a legal entity, such as a partnership or corporation, the legal entity serves as a "distinct structure" differentiating the criminal enterprise from the criminal acts it commits. *See Kragness,* 830 F.2d at 855 n. 10. On the other hand, when the enterprise "is wholly criminal," then, argues the State, "the facts used to support the predicate offenses may be the same as the facts used to prove the existence of the enterprise"; and so, in such a case, a "distinct structure" is unnecessary, even if the enterprise is only an association-in-fact.

This reasoning is not without merit, except for the fact that the commission of criminal acts will always involve some organizational enterprise on the part of the participants. If this minimal cooperative effort is all that is required for the existence of an enterprise, then the RICO offense collapses into nothing more than the enhanced punishment of recidivists. To avoid this collapse, we think there must be some requirement focusing the statute on "organized crime" and excluding ordinary, run-of-the-mill criminal activity.

The legislative history of Minnesota's RICO law sheds, at best, a flickering light on the meaning of "enterprise."[4] Clearly, our statute is not limited to drug "kingpins" or major crime syndicates, but neither do we think our Act is intended to make a racketeer out of every criminal offender. It is highly relevant that the penalty imposed by our state legislature for a RICO conviction is up to 20 years in prison and a fine up to $1 million. Minn.Stat. § 609.904, subd. 1 (1992). The statute also provides for injunctive relief, restitution, and an alternate fine amounting to three times the loss caused or illegitimate profits gained, *id.,* as well as criminal forfeiture, Minn.Stat. § 609.905.

■ To repeat, the State claims that the facts for proving the predicate offenses are the same facts that prove the existence of an illicit enterprise. This is not entirely true. To prove the offense of racketeering, not only must the State prove certain predicate criminal acts, but it must also prove a "pattern of criminal activity," and this pattern involves more than just the predicate criminal acts. The "pattern of criminal activity" (or "pattern of racketeering" under the federal Act) has its own separate statutory definition. And, significantly, the definition of "pattern" under the state Act spells out requirements that are not spelled out in the federal Act.[5]

Under the federal RICO law, a "pattern of racketeering" is defined simply as requiring at least two acts of racketeering activity within a certain time frame. *See* 18 U.S.C. § 1961(5) (1988). Under the Minnesota statute, a "pattern of criminal activity" not only requires the requisite number of criminal acts (three or more) within a specified time frame, but specifies (1) that the criminal acts must neither be isolated incidents nor the equivalent of a single offense, and (2) that

4. For example, in a subcommittee meeting Senator Merriam asked witness Stephen Kilgriff, an assistant attorney general speaking on behalf of the proposed legislation, whether the definition of enterprise would include any common undertaking of two or more people. The witness, after noting that RICO covered any "structural organization" or association-in-fact, went on to say:
Case law on this would indicate that you must have a structure, that it cannot be just a group of people acting—what that is, is just a conspiracy; but you must have a hierarchy. You must have people telling people what to do. You must have, in a legitimate enterprise, of course they have titles. In an illegitimate enterprise, such as a gang, they oftentimes have titles but not necessarily. So you're correct that the definition is broad, but it also, it's clear that it does need a structure, and it is the type of sophistication that the law is trying to get at.

Hearing on S.F. 483, Sen.Judic.Comm., Crim. Law Div., 76th Minn.Leg., March 31, 1989 (audio tape).

5. In 1985, an ABA Committee issued a report on the federal RICO Act. American Bar Ass'n, Criminal Justice Section, *A Comprehensive Perspective on Civil and Criminal RICO Legislation and Litigation* (April 1985). This report recommends that state legislatures substitute the phrase *criminal activity* for the "pejorative" federal phrase *racketeering activity,* because RICO may apply to kinds of "criminal conduct unrelated to traditional notions of organized crime." *Id.* app. A at 4. It appears the drafters of Minnesota's RICO Act adopted this recommendation. The ABA Report, it might also be noted, expresses concern that RICO not be applied to situations where its severe strictures are not warranted. *Id.* at 24–26 (commentary to Model RICO Act).

the criminal acts be related "through a common scheme or plan or a shared criminal purpose," or be committed, solicited or aided by persons mentally culpable for the crimes and associated with or in an enterprise involved in those activities.[6]

■ If the purpose of the *Bledsoe*, "distinct structure" requirement is to avoid casting too wide a net and catching the unorganized criminal, then, it seems to us, the definition of "pattern of criminal activity" spelled out in our state's RICO Act in large part accomplishes this purpose. Isolated, sporadic criminal acts do not count. The criminal acts must be related through a common plan or shared purpose, or alternatively, must be committed or promoted by persons associated with the enterprise.

It is when the enterprise is an "association-in-fact" that the *Bledsoe* concerns become most prominent. In this situation, there is no legal entity identifiable as an organizational structure. The group or association is likely loosely structured and quite informal, and hard evidence of a business-like organization is difficult to come by. It is here that the danger of RICO being expanded into an enhancement statute for recidivists is greatest. This danger can be obviated, we think, if it is shown that there is an organizational set-up, whether formal or informal, that not only exists to commit the predicate acts but also does more, such as coordinating those acts into an overall pattern of criminal activity.

■ It is enough here, we believe, after reviewing the cases and comments on the federal Act, that we conclude an "enterprise" under Minnesota's RICO Act is characterized by—

1) a common purpose among the individuals associated with the enterprise; where

2) the organization is ongoing and continuing, with its members functioning under some sort of decisionmaking arrangement or structure; and where

3) the activities of the organization extend beyond the commission of the underlying criminal acts either to coordinate the underlying criminal acts into a pattern of criminal activity or to engage in other activities.[7]

---

6. Minn.Stat. § 609.902, subd. 6, reads in its entirety:
   "Pattern of criminal activity" means conduct constituting three or more criminal acts that:
   (1) were committed within ten years of the commencement of the criminal proceeding;
   (2) are neither isolated incidents, nor so closely related and connected in point of time or circumstance of commission as to constitute a single criminal offense; and
   (3) were either: (i) related to one another through a common scheme or plan or a shared criminal purpose or (ii) committed, solicited, requested, importuned, or intentionally aided by persons acting with the mental culpability required for the commission of the criminal acts and associated with or in an enterprise involved in those activities.

7. These three characteristics of an "enterprise" are derived from Eighth Circuit case law. The first two characteristics are a "common or shared purpose" and "continuity of structure." *See United States v. Kragness*, 830 F.2d 842, 855 (8th Cir.1987); *United States v. Bledsoe*, 674 F.2d 647, 665 (8th Cir.1982). Under our formulation of the enterprise's profile, "continuity" is explained and described as evidenced by an ongoing decisionmaking organization or structure. The third requirement explains that this organization or structure must do more than just commit the predicate crimes; it must either coordinate the criminal acts into a pattern (as "pattern" is defined under our state RICO Act), or the organization must engage in other activities. This assures an entity distinct from the predicate crimes. Sporadic criminal acts are not enough.

The dissent points out that the third "prong" of our enterprise formulation does not mention an "ascertainable structure," *i.e.*, a structure "distinct from that inherent in the conduct of a pattern of racketeering." *Kragness*, 830 F.2d at 855; *Bledsoe*, 674 F.2d at 665. We have, however, couched our third characteristic in terms of the Eighth Circuit's own explanation of what it means by an "ascertainable structure." In *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 770 (8th Cir.1992), the Eighth Circuit explained that the focus of the "distinct structure" inquiry is on "whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense." *See also Bledsoe*, 674 F.2d at 665 (distinct structure can be shown by "an organizational pattern or system of authority beyond what was necessary to perpetuate the predicate crimes").

The term "enterprise" under RICO is one of those subjects that the more it is explained—at least in the abstract—the more elusive it becomes, and there is the danger of paraphrasing the term to death. Thus we have tried to keep our basic formulation simple and functional. It

In the trial of this case, the trial court instructed the jury on the pertinent sections of our RICO Act, but generally, henceforth, the jury should also be instructed on the characterizations of an enterprise listed above.

## II.

We now review the evidence in light of the foregoing analysis.

■ In this case, the State claims the enterprise involved was an "association-in-fact." It is undisputed that the five convictions for coercion are proper predicate criminal acts that occurred during the proper time frame. Defendant claims, however, that as a matter of law there was no "enterprise."

Defendant concedes that he and his associates had "a common purpose," namely to extort money from the restaurant owner. This satisfies the first requirement.

The second requirement is an organization that is ongoing and continuing. In other words, there must be some continuity of structure and personnel. This requirement is also met. The extortion extended over a period of 6 months until exposed. Defendant would come to the restaurant accompanied usually by three other persons who stayed in the car. The victim was told over the telephone that if he did not make the payments demanded by the defendant, the gang would kill him and his family. There was a regular, business-like monthly payment and collection schedule, with the payment usually preceded by a telephone call from the defendant. The victim was instructed on how payment was to be made. All of the instruments were made out to the same individual in Texas, and all passed through various Texas businesses and financial institutions. A reduction in the amount of the monthly payment was allowed by the defendant, but only after he went outside the restaurant for several minutes, from which the jury could have inferred that fixing the amount of the extortion payments required conferring with associates. For the last payment, defendant arranged for a sub-stitute to make the pickup. The substitute's "failed" memory at trial suggests the organization had means of enforcing discipline. Defendant received $700 a month, which, since he was unemployed, the jury could have inferred was for services rendered "the gang."

It is the third requirement that presents the closest question. Did the organization's activities extend beyond that required for the commission of the underlying criminal acts? We conclude the third requirement has been met. Here the "association-in-fact" was organized to do more than commit acts of extortion. The group's organized activities extended to routing the extorted monies through different banking institutions and different endorsees in another state.

Defendant and the dissent argue that this systematic money laundering was done in furtherance of the underlying coercion offenses. This may be so, but it was not necessary to the commission of the underlying criminal acts. The defendant could have demanded payments in cash or could have cashed the money orders in-state, rather than routing them through Texas. *Cf. Diamonds Plus, Inc. v. Kolber,* 960 F.2d 765 (8th Cir.1992) (part of the scam involved use of the defendant's law office to handle inquiries from fraud victims; held to show an ascertainable structure).

What we have here is an organized group extorting protection money from a restaurateur, a rather common form of racketeering, but where it is difficult to get evidence of the organizational framework of the criminal enterprise. Nevertheless, we find that the evidence presented by the State, together with the inferences the jury could draw therefrom, is sufficient beyond a reasonable doubt to sustain the RICO conviction.

## III.

■ The court of appeals held that the trial court could impose sentences for both racketeering and the separate crimes consti-

should be remembered that our state act already defines the term "enterprise," and this supplemental formulation is intended to assure that that "enterprise" is not simplistically equated with the sum of its predicate crimes, even though, as *Turkette* observes, evidence of the two concepts may at times "coalesce." *See* 452 U.S. at 583, 101 S.Ct. at 2528.

tuting the predicate acts. Defendant does not appeal this ruling. The court of appeals also held that the trial court may not use the *Hernandez* method of calculating a defendant's criminal history score unless sentencing for multiple crimes is permitted under Minn.Stat. § 609.035 (1992); thus, the appellate panel stated the trial court should have sentenced defendant first for the racketeering offense, and the panel therefore remanded for resentencing. The State does not appeal this ruling. Finally, the court of appeals held that ranking racketeering at severity level VIII is appropriate. *Huynh,* 504 N.W.2d at 484–85. Defendant appeals this ruling.

In sentencing defendant, the trial judge observed that defendant's crime involved serious gang activity that went on for a long period of time. It involved guns, money laundering, and the threat of murder, not only of the victim but of the victim's family. This organized preying upon vulnerable people, the judge concluded, justified a severity level VIII ranking.

We hold that this sentence was within the trial court's discretion. Because racketeering is an offense separately defined by the legislature and not ranked in the Minnesota Sentencing Guidelines, ranking is left to the discretion of the trial court. Minnesota Sentencing Guidelines II.A.03 comment, II.A.05 comment. As the court of appeals noted, the penalties for racketeering are similar to the penalties for offenses ranked by the Guidelines as severity level VIII offenses, such as first degree assault. *Compare* Minn.Stat. § 609.904, subd. 1 (penalty for racketeering may not be more than 20 years imprisonment, fine of $1,000,000, or both) *with* Minn. Stat. § 609.221 (penalty for assault in the first degree may not be more than 20 years imprisonment, fine of $30,000, or both). *See also* Minnesota Sentencing Guidelines IV. The legislature clearly intended to punish severely those persons who engage in racketeering.

We affirm the court of appeals, including the remand to the district court on the resentencing matter.

Affirmed.

GARDEBRING, Justice (dissenting).

We are asked in this case to decide what constitutes an "enterprise" under Minnesota's Racketeer Influenced and Corrupt Organizations Act (RICO), Minn.Stat. § 609.903, subd. 1(1) (1992). Although the issue is one of first impression for this court, many federal courts have considered it in the context of the federal RICO law. I agree with the majority opinion that we should look to federal courts' interpretations of the federal RICO law in interpreting our state RICO statute. In spite of the existence of the well-reasoned federal cases discussed in the majority opinion, however, the majority adopts its own test for the existence of an "enterprise" which departs substantially from any test applied in the federal courts. This departure allows the majority to uphold the RICO conviction in this matter in the face of an utter absence of evidence establishing anything beyond multiple acts of extortion. This change is particularly troublesome because, without a stringent test, the statute becomes merely a sentence enhancement mechanism available at the whim of the prosecutor. I would adopt the test developed by the Eighth Circuit Court of Appeals and subsequently adopted by other federal appeals courts; because the evidence in this case is insufficient to support a RICO conviction under that test, I respectfully dissent.

As the majority points out, the United States Supreme Court has ruled that the state must prove both the existence of an "enterprise" and a pattern of criminal activity to sustain a RICO conviction. *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). The Supreme Court stated:

The enterprise is an *entity,* for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. * * * [I]t is proved by *evidence of an ongoing organization,* formal or informal, and by *evidence that the various associates function as a continuing unit.* * * * The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages.

*Id.* at 583, 101 S.Ct. at 2528–29 (emphasis added). As the majority notes, the Eighth Circuit Court of Appeals has set out a three-part test for the existence of an "enterprise" under the federal RICO statute. Under that test, three characteristics distinguish a RICO enterprise:

First, there must be a common or shared purpose that animates the individuals associated with it. Second, it must be an "ongoing organization" whose members "function as a continuing unit," [citing *Turkette* ]; in other words, there must be some continuity of structure and personnel. Third, there must be an *ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity.*

*U.S. v. Kragness*, 830 F.2d 842, 855 (8th Cir.1987). While the second and third parts of the test are related, the court identified its rationale for requiring proof of all three characteristics. One is to avoid the danger of "guilt by association" that may arise because RICO does not require proof of an agreement among the members of the "enterprise" as would be required in a conspiracy case. *Id.* Another reason is to ensure that RICO's targets, criminal enterprises, "are distinguished from individuals who associate for the commission of sporadic crime." *Id.*

The majority adopts the first prong of the *Kragness* test which requires a common purpose among the individuals associated with the enterprise. The second prong of the *Kragness* test is whether there is "an 'ongoing organization' whose members 'function as a continuing unit', * * * [with] some continuity of structure and of personnel." *Id.* at 855. It appears that, despite some changes in wording, the majority has adopted the

*Kragness* second prong; the majority later describes the requirement as "some continuity of structure and personnel." The *Kragness* court further defined these terms as follows:

Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis. The continuity-of-personnel element involves a closely related inquiry, in which "[t]he determinative factor is whether the associational ties of those charged with a RICO violation amount to an organizational pattern or system of authority."

*Id.* at 856 (citations omitted). I understand the second prong as a temporal element, requiring proof of relationships and structure existing over time for the commission of the predicate criminal acts as well as others. Assuming that the court intends to adopt such a definition, I agree with its formulation of the second prong.

The third prong of the majority's test, however, inexplicably departs from the *Kragness* test. Instead of requiring "an ascertainable *structure* distinct from that inherent in the conduct of a pattern of racketeering activity," the majority would require the state to prove that "the *activities* of the organization extend beyond the commission of the underlying criminal acts either to coordinate the underlying criminal acts into a pattern of criminal activity or to engage in other activities." Such a test focuses on "activities" to prove the existence of an enterprise, rather than requiring proof of what is an essential element of an "enterprise," a continuing organization with structured relationships.[1] Allowing the state to prove the

---

1. A similar problem with the majority's third prong is that it overlaps with the *separate* statutory requirement that the state prove a "pattern of criminal activity" to obtain a RICO conviction. As the majority points out, the Minnesota RICO statute lays out specific elements necessary to prove a "pattern of criminal activity." One of those elements is that the incidents were committed, solicited, aided by, etc., persons associated with or in an *enterprise* involved in the crime. Minn.Stat. § 609.902, subd. 6(3) (1992) (emphasis added). Using "coordina[tion of] the underlying criminal acts into a pattern of criminal activi-

ty" to prove enterprise, as the majority does, *supra* at 10, employs circular reasoning to collapse the two separate elements of enterprise and pattern into one element. This collapse of the two statutory requirements into one also contradicts the Supreme Court's observation in *Turkette* that "[t]he enterprise is an entity, * * * a group of persons associated together for the common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute." *Turkette*, 453 U.S. at 583, 101 S.Ct. at

existence of an enterprise through proof of its "activities" contradicts the Supreme Court's directive that the enterprise is "an entity separate and apart from the activity in which it engages." *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2529.

The inherent flaws of this new test are illustrated by its application to the instant case. Because the test collapses the requirements for a "pattern of criminal activity" and an "enterprise," the majority concludes that the state has established beyond a reasonable doubt the existence of an "enterprise" based upon the very minimal facts proven in this case. The appellant conceded that the first prong of the *Kragness* test, a common purpose among the defendant and his associates, was met in his case. The second prong requires proof of continuity of structure or personnel. The court finds the continuity requirement met in this case because the appellant, accompanied by others, collected the funds from the restauranteur over a period of 6 months, collected payments on a regular basis and instructed the restauranteur as to how they should be made, reduced the monthly amount upon request after leaving the restaurant for a brief period, sent a substitute to pick up the last payment, and received unexplained payments each month. These facts prove nothing more than that appellant successfully extorted money from the restauranteur over time. There was no evidence that there was any continuity among individuals accompanying appellant on different visits or that the same individuals negotiated the checks or money orders. No proof was introduced to establish continuity of structure or personnel beyond appellant himself, and no organizational pattern or system of authority was proved.

Had the court asked what "ascertainable structure" the state had proven, the answer would have been very difficult to find. Even the majority acknowledges that this is a case "where it [was] difficult to get evidence of the organizational framework of the criminal enterprise," *supra* at 197. In fact, there was none. There was no evidence introduced showing any relationship or contact between appellant and the person in Texas who signed some of the payments. The person in Texas was identified only by showing a driver's license with his name on it. There was no testimony regarding involvement in the "enterprise" of the "associates" who accompanied appellant on one visit to demand money of the restauranteur and who waited in the car on other occasions. None of these "associates" was ever identified or charged with any crime. The only "associate" produced at trial was the man who picked up the last payment and was arrested, Son Thanh Tran. Tran did not testify at trial regarding how he became involved in the extortion, but a police officer's testimony that Tran told police that appellant called him from California and asked him to pick up the check was admitted as impeachment evidence. There was testimony from appellant's ex-girlfriend that appellant received $700 per month from an unknown source while he was unemployed. There was, however, no evidence introduced to link that payment in any way to any of the "associates," or to any criminal enterprise.

The court relies heavily on the restauranteur's testimony that the person who called him by telephone and demanded the payments said he was a member of an Asian gang and that "they" would kill him and his family if he did not make the payment. With this statement in evidence, the court today decides that the jury could infer that the $700 payment was for "services rendered 'the gang' "; that the man who was arrested for picking up the last check did not implicate appellant in his trial testimony because "the organization had means of enforcing discipline"; and that appellant left the restaurant briefly before accepting a reduction in the payment because "fixing the amount of the extortion payments required conferring with associates." These inferences are allowed to sustain the conviction in spite of the fact that no evidence whatsoever was introduced tending to prove the actual existence of a gang, the gang's structure or membership, or the gang's ability to enforce discipline. Nor was there any evidence that appellant conferred with anyone when he allowed the reduced payment, or that he received any payment

2528. As the Court noted, "proof of one does not necessarily establish the other." *Id.*

from anyone associated with the "gang." As another court faced with inferences based on gang membership observed, "[m]embership in an organization does not lead reasonably to any inference as to the conduct of a member on a given occasion." *In re Wing Y.*, 67 Cal.App.3d 69, 136 Cal.Rptr. 390, 395 (1977).

That such "inferences" in the absence of evidence can be used to justify a conviction of a crime as serious as a violation of the RICO statute demonstrates the inadequacy of the court's proposed test for the existence of an enterprise. As the majority points out, the penalty imposed by the RICO statute is a harsh one; conviction may result in up to 20 years in prison and a fine of up to $1 million, injunctive relief, civil forfeiture and restitution. I agree with the majority that this statute was meant only to apply to *organized* crime, but I would apply the *Kragness* test without the court's modifications. Applying that test, I find insufficient evidence of an enterprise in this case because no evidence was introduced that would support a finding of an *ascertainable* structure apart from that necessary to commit the predicate acts of coercion.

Further, even under the weaker version of the test for the existence of an "enterprise" adopted by the majority, I disagree that the evidence in this case is sufficient to support appellant's conviction on the RICO charge. Under the majority's third prong, the state may show that the organization's activities extended beyond the commission of the underlying acts, either to coordinate the underlying acts into a pattern of criminal activity or to extend them into other avenues of illegal activity. The court finds its test satisfied in this case because the organization's activities extended into money laundering which was not necessary to the underlying criminal acts of coercion. I do not believe that appellant's actions to convert the money he extorted from paper instruments to cash were activities which extended beyond the commission of the underlying criminal acts of extortion. The existence of "money laundering" does not provide the proof of a separate entity required by *Turkette;* appellant had to negotiate the checks and money orders in some fashion to have access to the fruits of his crime. Nor was any evidence introduced that an organization coordinated appellant's acts of extortion.

When the state proves the violation of a criminal statute beyond a reasonable doubt, the perpetrator should be held accountable and sanctioned, with a tough sentence when appropriate. Appellant in this case was properly convicted and sentenced for multiple counts of coercion. The state did not, however, introduce sufficient evidence of an "enterprise" to support a conviction under Minnesota's RICO statute. There may have been an Asian gang supporting or directing appellant's acts of extortion, but the state did not prove this element beyond a reasonable doubt. I cannot condone an interpretation of the RICO statute which invites the state to add the very serious charge of a RICO violation every time two or more defendants are charged with committing three or more criminal acts. I am even less prepared to support the majority's interpretation of the statute in this case where the minimal evidence that appellant was a member of a gang was found to support detailed "inferences" regarding facts not in evidence. The court's decision today demonstrates the validity of the Eighth Circuit's fear that unless evidence is introduced satisfying all three elements of its test, courts will be unable to ensure that RICO's targets, criminal enterprises, are distinguished from individuals who associate for the commission of sporadic crime.

WAHL, Justice (dissenting).

I join in the dissent of Justice Gardebring.